**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JON JERNIGAN, et al.,

    Plaintiffs,

    v.

NATIONWIDE MUTUAL INSURANCE COMPANY,

    Defendant.
_____/

No. C 04-5327 PJH

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

    Defendant's motion for summary judgment came on for hearing before this court on February 1, 2006. Plaintiffs appeared by their counsel Todd B. Gary, and defendant appeared by its counsel Julian J. Pardini. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the motion as follows.

**BACKGROUND**

    This is a breach of insurance contract case. Plaintiffs are Jon Jernigan ("Jernigan"), individually and as trustee of the Jernigan Family Living Trust; and Chuck Scoble ("Scoble"), individually and as trustee of the Scoble Family Living Trust. In December 1998, Jernigan and Scoble purchased a piece of real property ("the property") located at 300 Bell Avenue in Windsor, California. At the time of the purchase, there were three buildings standing on the property – an old wood-frame building known as the Windsor

Feed and Supply Building ("the Feed and Supply Building"), and two auxiliary buildings.

On December 30, 1998, defendant Nationwide Mutual Insurance Company ("Nationwide") issued Jernigan and Scoble a commercial property policy, which was renewed annually thereafter. The Nationwide policy is an "all risk" policy, covering all risk of loss unless specifically excluded. The insuring agreement states, "We will pay for direct physical loss of or damage to the Covered Property . . . caused by or resulting from any Covered Cause of Loss," unless the loss is specifically excluded or limited. The term "Covered Cause of Loss" also includes "Collapse" of a building, defined as "an abrupt falling down or caving in of a building" if caused by certain specified causes of loss.

Jernigan and Scoble planned to develop the property with a ten-unit live-work industrial/residential mixed-use project which would incorporate the 10,800 square-foot Feed and Supply Building. Approximately 18 months after they purchased the property, plaintiffs obtained approval from the Town of Windsor for their development plans. The Town issued the permits contingent on the renovation of the Feed and Supply Building. At some point during the development process, plaintiffs began negotiating with a prospective tenant for the Feed and Supply Building space, Siduri Winery.

Jernigan and Scoble hired Harvey Charnofsky ("Charnofsky"), a developer, to serve as the project manager for the development. Charnofsky was to be paid to serve as the general contractor, and also was to receive a portion of the profits from the development. In September 2002, Charnofsky hired Daniel O. Davis ("Davis"), a Santa Rosa demolition contractor, to perform demolition work at the site, for $40,000. Davis' bid stated in part, "Demolish and remove buildings, concrete debri[s], and brush inside of fence line . . . " When Charnofsky signed the bid (turning it into a contract), he added, "Including interior wood floor and floor joists and mezzanine and interior walls, corrigated [sic] metal from remaining building."

The contract required that Davis obtain the necessary permits. Davis submitted a permit application to the Town of Windsor, consisting of the application page and a site plan. The permit application describes the scope of work as "Demolish & Remove comm'l

2

building." The permit was issued on September 25, 2002. According to Davis, the copy of the permit he received from the Town did not have the attached site plan, although the site plan apparently indicated that only the two auxiliary buildings – not the Feed and Supply Building – were to be demolished.

Davis demolished the two auxiliary buildings, and cleared away the debris. He then removed the siding and the floor of the Feed and Supply Building. All the work performed by Davis to that point was in conformance with the demolition permits. Davis stopped the demolition work at about the time that the winter rains began.

Davis and his workers had reported to Charnofsky that the wood beams and trusses of the Feed and Supply Building had considerable dry rot. At some point, Charnofsky hired Vinson Engineering ("Vinson") to evaluate the internal structure of the building. Vinson's inspection revealed extensive areas of dry rot that rendered the wood incapable of supporting any load, and also revealed significant problems with the trusses and other problems that indicated the building lacked structural integrity and that its rehabilitation would be "cost-prohibitive." Vinson advised Charnofsky of these problems, and subsequently issued a written report dated January 29, 2003.

According to Davis, Charnofsky asked him in mid-January 2003 how much additional he would charge to demolish the remainder of the Feed and Supply Building. Davis verbally quoted him a price of $8,500. Davis claims that Charnofsky then told him he wanted the work done, "the sooner the better." Davis took this as a direction to proceed with demolishing the building. He testified in his deposition that he did not apply for additional demolition permits because he thought the permits previously obtained applied to the whole property, and that he didn't question Charnofsky when Charnofsky told him to demolish the remainder of the building. Nor did he contact the Town to ascertain whether the existing permit would cover the additional work.

Charnofsky's version of events differs slightly. He claims that in January 2003, after the discovery of some dry rot in the framing and structural members of the Feed and Supply Building, he discussed with Jernigan and Scoble the possibility of "reconstructing"

3

the building to "match the rendering approved by the Town of Windsor," as opposed to keeping and strengthening the existing structural elements. In a declaration dated August 22, 2003, Charnofsky stated, "In connection with that, I asked Davis to provide an estimate to clear the site, including the Feed and Supply Building, and he quoted me $8,500." Charnofsky asserted further that after he had obtained approval from the plaintiffs for that price, he "asked Davis to proceed with the process of potentially demolishing the Feed and Supply Building." According to Charnofsky, this process was to include "the same process as the earlier work" – preparing and sending a contract for final approval and execution, obtaining a permit from the Town of Windsor, and giving Charnofsky notice before the work began.[1]

On January 15, 2003, Charnofsky advised Jernigan and Scoble by e-mail that Davis had quoted a price of $8,500 to demolish the remainder of the building, "in addition to the $40,000 already quoted," adding that "[t]he site will be cleared in the next two weeks," and stating, "I authorized the additional demolition."

Shortly thereafter, Davis resumed work at the property. He completed the demolition of the building by January 23, 2003. On that date, a Town of Windsor building inspector visited the site, determined that Davis had exceeded the scope of the permit, and issued a stop-work order.

Charnofsky stated in his declaration that prior to January 23, 2003, Davis did not provide him with a contract for the additional demolition work, did not obtain a permit from the Town of Windsor for the work, and did not advise him (Charnofsky) that he (Davis) was going to start the work. Charnofsky specifically stated that he did not authorize Davis to demolish the building "without a proper permit, and would never have allowed the building

---

[1] All the deposition excerpts submitted as evidence in connection with the present motion were taken in the Sonoma County Superior Court case filed by Jernigan and Scoble against Davis In its October 30, 2003, letter denying plaintiffs' claim, Nationwide notes that it appeared that Charnofsky was the one who instructed Davis to demolish the building, but that it was not certain, as Jernigan and Scoble had refused to produce Charnofsky for a sworn examination and would not allow Charnofsky to be interviewed by a Nationwide representative. They did provide Nationwide with a written statement from Charnofsky. This is the August 22, 2003, declaration of Charnofsky submitted as evidence by plaintiffs herein.

4

1 to be taken down without a proper permit."

2 On January 28, 2003, Charnofsky wrote an e-mail to Rick Jones, a member of the
3 Windsor Planning Committee's staff, explaining that after his workers had gutted the Feed
4 and Supply Building pursuant to the demolition permit, they had discovered that the dry rot
5 was so extensive that the structure would have to be replaced.  He noted that he had asked
6 Jones in mid-January whether a building that looked like the old one on the outside, but
7 with a steel frame structure, would be acceptable to the Town Council in terms of their
8 approval of the development.  He stated that Jones had responded that as long as the
9 building looked like the old one, it would be acceptable.

10 On January 29, 2003, Charnofsky wrote to Windsor Town Manager Paul Berlant,
11 stating that Vinson Engineering had advised him that the structural integrity of the Feed and
12 Supply Building was "minimal," and also stating that he had advised the Town Planning
13 Staff verbally of the engineer's findings and asked if they could remove the building, so long
14 as the building that replaced it looked like the old building.

15 In an editorial for the week of January 29-February 4, 2003, the Windsor Times ran
16 an article about the non-permitted demolition of the building.  The article quoted a member
17 of the Town Council as stating that Charnofsky had torn down the building "without a word
18 to the town" and without a permit.  The article quoted Charnofsky as saying, "We just didn't
19 arbitrarily go out there and knock it down.  We got permission from the planning staff to
20 take the building down . . . Our original plan was to rehabilitate [the building], but as we got
21 more into the evaluation, it was so deteriorated that it was just not economically feasible.
22 . . . I thought I had permission."

23 On March 25, 2003, Davis wrote a letter to the Mayor of Windsor, stating that he
24 regretted that the Feed and Supply Building "came down without a demolition permit," and
25 that he wanted to apologize to the Mayor and the Town.  He explained that "the basis of the
26 mistake made by our firm" was the fact that the site plan that he had submitted with the
27 permit application was not attached to the issued permit.  He stated that the owners "did
28 not direct us to remove the feed and seed building without a proper demolition permit."

At an April 2, 2003, meeting, the Windsor Town Council considered whether to reinstate the use permit that had previously been issued for construction of the project. The Council considered several resolutions, each of which stressed that the permit had been issued based on plaintiffs' representations that the Feed and Supply Building would be "remodeled," but that the non-permitted demolition of the building had changed the project from one of remodeling to one of "reconstruction."

On April 16, 2003, the Council met again. Davis made an appearance at the meeting, where he stated that the demolition of the Feed and Supply Building without a permit was "just a terrible, terrible oversight on my part." He added that he took responsibility for the demolition, but also stated that it had not been his intent to demolish without a permit.

At the April 16, 2003, meeting, the Council adopted a resolution finding that the project plan as earlier submitted and approved was, in light of the demolition of the building, "no longer consistent with the project description and representations made to the Town Council for the purpose of obtaining entitlements granted." The Council refused to reinstate the use permit and directed that a variety of changes be incorporated in a revised project description prior to the Council's further consideration of the project. Jernigan and Scoble then determined that the changes that the Council required would make the project financially unfeasible, and abandoned the effort. They subsequently sold the property.

The Nationwide commercial property policy was in effect from December 30, 2002, to December 30, 2003, for the property. On February 5, 2003, Jernigan and Scoble reported the claim to Nationwide. The report of the claim stated, "Insured stated that he hired contractor to do examination, including removal of skin and some floorboards to view completely. Subcontractor came in after the examination had been completed and demolished the entire building. Insured found out about this through newspaper. No authority or approval."

On June 1, 2003, Jernigan and Scoble submitted their sworn statement in proof of loss, identifying the cause and origin of the loss as "Negligence/Demolition." They stated

6

that the amount of the loss was $515,225, which equaled the combined policy limits for the building ($435,225) and for business income loss ($80,000).  After a thorough investigation, including retaining coverage counsel and taking sworn statements from Jernigan and Scoble, Nationwide advised plaintiffs on October 30, 2003, that there was no coverage.

Nationwide denied the claim on the grounds that Jernigan and Scoble had participated in the decision to demolish the building, and that the loss was therefore not "fortuitous," as required to obtain policy benefits, and was also not covered pursuant to California Insurance Code § 533 ("an insurer is not liable for a loss caused by willful act of the insured").  Alternatively, Nationwide asserted that the loss fell within the exclusion for "faulty, inadequate or defective . . . renovation, remodeling," and also might be excluded because of the exclusions for wear and tear, fungus, decay and deterioration, or "[a]cts or decisions, including the failure to act or decide, of any person."  Nationwide further advised Jernigan and Scoble that even if the demolition of the building was considered a "collapse," the policy would not provide coverage because such "collapse" was not caused by a covered cause of loss under the policy.  In addition, the claim for loss of business income was not covered for the same reasons, and was also too speculative to establish coverage.

Meanwhile, on June 13, 2003, Jernigan, Scoble, the Jernigan Family Living Trust, and the Scoble Family Living Trust had filed suit against Daniel O. Davis, Inc., in the Superior Court of California, County of Sonoma, alleging breach of contract, negligence, negligence per se, and trespass (<u>Jernigan v. Davis</u>, Case No. 232893).  The parties agreed to submit the dispute to binding arbitration, and a hearing was conducted on December 20, 2004.  In the statement of decision, issued December 23, 2004, the arbitrator awarded the plaintiffs $2,522,714 against Davis.

The arbitrator found that Davis had a duty to perform the agreed-upon renovation of the structures, including the necessary permit processing, in a competent and professional manner.  The arbitrator found further that Davis had breached this duty "by using defective methods of renovation and thus negligently causing the collapse of the Feed and Supply Store without lawful permission to do so."

The arbitrator found as follows: Davis admitted he was responsible for obtaining the necessary permits; the demolition of the building was in fact done without a proper permit and was thus a defective method of renovation; Davis admitted that his failure to obtain a permit was a "terrible, terrible oversight" on his part – namely, in wrongly assuming that the previous permit was sufficient; the permit on file with the Town of Windsor clearly indicated that only the two auxiliary buildings were to be demolished; the Feed and Supply Building was excluded from the demolition permit; the Town of Windsor Building Code provides that separate permits are required to demolish or renovate separate buildings; and Davis admitted he should have been more careful in clarifying which buildings were to be demolished under the original permit application.

The Superior Court entered judgment on February 17, 2005. Davis reached a post-judgment settlement agreement with the plaintiffs whereby he provided plaintiffs with a promissory note in the amount of $250,000, and assigned them his rights against his liability insurer, which had denied his tender of defense and indemnity

On November 2, 2004, plaintiffs filed the present action in the Superior Court of California, County of Sonoma, alleging breach of contract, insurance bad faith, and unfair business practices in violation of California Business & Professions Code § 17200, and seeking compensatory and punitive damages. On December 4, 2004, Nationwide removed the case, asserting diversity jurisdiction.

Nationwide now seeks summary judgment, or in the alternative, summary adjudication.

**DISCUSSION**

A.   Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

8

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

"To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least some significant probative evidence tending to support the complaint." Smolen v. Deloitte, Haskins & Sells, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted). The court must view the evidence in the light most favorable to the non-moving party. United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir. 2003). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999). If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323. Regardless of whether plaintiff or defendant is the moving party, each party must "establish the existence of the elements essential to [its] case, and on which [it] will bear the burden of proof at trial." Id. at 322.

B.   Nationwide's Motion

Nationwide seeks summary judgment on the ground that Davis' intentional, engineered demolition of the Feed and Storage Building was not a covered "fortuitous" loss – that is, an unforeseen event, not caused by the insured, and not an event that could have been prevented by the insured – and was excluded by various provisions of the policy. Thus, Nationwide asserts, its denial of the claim was proper and did not constitute a breach

9

of contract. In the alternative, Nationwide seeks summary adjudication of the breach of contract claim, based on the applicability of certain exclusions in the policy; and also seeks summary adjudication of the claim of breach of the implied covenant of good faith and fair dealing, the § 17200 claim, and the punitive damages claim. Nationwide asserts in addition that plaintiffs' alleged business losses are speculative, and that it is entitled to a set-off in the amount of the judgment that plaintiffs obtained against Davis.

Plaintiffs oppose the motion, arguing that the Feed and Supply Building was completely destroyed, constituting a loss of a covered building, caused by risk not excluded under the policy. Plaintiffs contend that Nationwide's refusal to pay benefits under the policy constitutes breach of contract; that the claims for bad faith, punitive damages, and unfair business practices are supported by evidence sufficient to submit those claims to the trier of fact or to permit further discovery under Federal Rule of Civil Procedure 56(f); that plaintiffs' claims of lost business income are covered under the policy; and that Nationwide is not entitled to a set-off for the potentially unrecoverable judgment against Davis.

Because the court finds that plaintiffs have not met their burden of showing that the demolition of the Feed and Supply Building was a covered cause of loss, summary judgment must be GRANTED on the breach of contract claim.

1.   Breach of Contract Claim

Nationwide argues that it did not breach the insurance contract because plaintiffs did not suffer a covered loss. Nationwide contends that the loss was not covered because the demolition of the building was not a fortuitous event, because plaintiffs did not suffer a "direct physical loss" caused by a covered cause of loss, and because the demolition of the building was not a "collapse." Nationwide also asserts that the demolition of the building is excluded from coverage under various exclusions set forth in the policy.

In opposition, plaintiffs assert that the destruction of the Feed and Supply Building constitutes a "collapse" under ordinary meaning and the plain language of the policy, and that the collapse of the building was caused by "defective methods in construction, remodeling or renovation" and is therefore within the express grant of coverage for

10

damages resulting from "collapse."

An "all-risk" policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an "all-risk" policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage. C.H. Leavell & Co. v. Fireman's Fund Insurance Co., 372 F.2d 784, 787 (9th Cir. 1967).

Before considering exclusions, a court must examine the coverage provisions to determine whether the claim falls within the terms of the policy. Waller v. Truck Ins. Exchange, 11 Cal. 4th 1, 16 (1995). "[W]hen an occurrence is clearly not included within the coverage afforded by the insuring clause, it need not also be specifically excluded." However, the burden is on the insured to bring the claim within the basic scope of coverage, and courts "will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage." Id. (citations and quotations omitted). Exclusions, by contrast, are narrowly construed and must be proven by the insurer. Id.

    a.    Whether the demolition of the building was a covered loss

Nationwide contends that plaintiffs did not suffer a "direct physical loss" caused by a covered cause of loss. The policy's "Building and Personal Property Coverage Form" endorsement provides, in section A (Coverage), "We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declaration caused by or resulting from any Covered Cause of Loss."

The policy's "Causes of Loss – Special Form" endorsement provides, in Section A (Covered Causes of Loss),

> When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:
>
> 1.    Excluded in Section B., Exclusions; or
>
> 2.    Limited in Section C., Limitations;
>
> that follow.

The "Causes of Loss – Special Form" endorsement, Section B (Exclusions),

11

provides, "2. We will not pay for loss or damage caused by or resulting from any of the following: . . . k.  Collapse, except as provided below in the Additional Coverage for Collapse. . . ."

The "Causes of Loss – Special Form" endorsement, Section D (Additional Coverage – Collapse) provides as follows:

1. with respect to buildings,

    a. Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;

    b. A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

    c. A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;

    d. A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

2. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if the collapse is caused by one or more of the following:

    a. The "specified causes of loss" or breakage of building glass, all only as insured in this Coverage Part;[2]

    b. Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

    c. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to the insured prior to collapse;

    d. Weight of people or personal property;

    e. Weight of rain that collects on a roof;

---

[2] "Specified causes of loss" means fire, lightning, explosion, windstorm or hail, smoke, aircraft or vehicles, riot or civil commotion, vandalism, leakage from fire extinguishing equipment, sinkhole collapse, volcanic action, falling objects, weight of snow, weight of ice or sleet, water damage.

12

> f. Use of defective materials or methods in construction, remodeling, or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in 2.a. through 2.e., we will pay for the loss or damage even if use of defective materials or methods in construction, remodeling or renovation, contributes to the collapse.

Nationwide argues that the "careful and meticulous demolition" by Davis, which involved attaching a cable to the trusses and tugging with an excavator until the building came down, does not qualify as a "collapse," which is defined by the policy as "an abrupt falling down or caving in of" the building. Nationwide also asserts that even if one were to consider Davis' "engineered demolition" of the building as a "collapse," the policy still would not provide coverage because such "collapse" would not have been the result of one or more "specified causes of loss" – decay, insects or vermin; weight of people or personal property; weight of rain; or the use of defective materials or methods in construction, remodeling or renovation.

In opposition, plaintiffs argue that it is undisputed that the building abruptly fell down with the result that it cannot be occupied for its intended purpose – which is what the policy definition of "collapse" requires. Plaintiffs assert that it is irrelevant that Davis carefully planned and executed the dismemberment of the building, where plaintiffs (the insureds) did not themselves carefully plan or meticulously dismember the building, and did not intend that Davis do so. They argue that the evidence shows that plaintiffs intended to retain and use the existing building unless approval for new construction could be obtained from the Town, which approval they had not even sought as of the date of the demolition. Plaintiffs claim that the building collapse, from the perspective of the insureds, was unquestionably unexpected and abrupt.

The court finds that the demolition of the building was not a "covered cause of loss" under the policy. The policy defines "collapse" as an "abrupt falling down." That is not the same as "intentional demolition." When used in an all-risk policy, in its plain, common and ordinary sense,

13

> "collapse" means a falling down, falling together, or caving into an unorganized mass. There is a collapse within the meaning of such a policy when there is a sudden or unusual shrinking, settling, or falling of the building or any part thereof, or a loss of form, support, rigidity, or connection with other parts. Collapse is a sudden and relatively abrupt occurrence causing serious structural damage, and not a gradual occurrence over a period of time.

10A Couch on Insurance (3d ed. 1998) § 148:54.

Moreover, the policy provides coverage for "collapse" only where it is caused by one of the following: the "specified causes of loss," listed in note 2, above; decay that is hidden from view; insect or vermin damage that is hidden from view; weight of people or personal property; weight of rain that collects on a roof; or use of defective materials or methods in construction or remodeling. Davis' intentional demolition of the Feed and Supply Building does not fall under any of these specific causes of loss, and is therefore not covered.

        b.      Whether policy exclusions apply to bar plaintiffs' claim

"Causes of Loss – Special Form," section A (Covered Causes of Loss") provides that "covered causes of loss" means "risks of direct physical loss" unless the loss is excluded (listed under "exclusions") or limited (listed under "limitations"). The policy also provides that if any of these excluded causes of loss result in a "Covered Cause of Loss," Nationwide will pay for the loss or damage caused by the "Covered Cause of Loss." Nationwide argues, however, that even if plaintiffs could establish a "direct physical loss" caused by a covered cause of loss, the denial of plaintiffs' claim was proper, as the demolition of the Feed and Supply Building was excluded from coverage under the exclusions for faulty or inadequate repair or renovation; acts and decisions of any person; operation of ordinance or law; and wear and tear, fungus, decay, and deterioration.

Having found that plaintiffs have not established a covered cause of loss, the court considers here only briefly whether any policy exclusions apply to bar the plaintiffs' claim. As the parties agree that no ordinance or law caused the demolition of the building, and that the destruction cannot be attributed to wear and tear, fungus, decay, or deterioration, the court does not address those exclusions.

With regard to the exclusion for faulty or inadequate repair or renovation, Nationwide

14

argues that the demolition can be said to have been "defective," in the sense that only part, but not all, of the building was to have been dismantled; or can even be said to have been "faulty" if Davis did not know but should have known that an additional permit was required; or "inadequate" if he did know that he needed an additional permit but nevertheless did not secure one. Nationwide contends that whichever term is used to describe the demolition, the loss is excluded under Exclusion B.3.c., above.

In opposition, plaintiffs assert that the "collapse" of the building was caused by defective methods in construction, remodeling, or renovation, and is therefore within the express grant of coverage for damages resulting from "collapse. They argue that under Exclusion B.3.c.2, the policy excludes coverage for defective renovation, unless the defective renovation causes the "collapse" of a building, which is expressly listed as a "Covered Cause of Loss." They contend that in that case, the policy extends coverage.

Plaintiffs also argue Nationwide has taken contradictory positions – arguing on the one hand that there is no coverage for "collapse" caused by defective methods of renovation because there was nothing defective in the methods used in the demolition process," while claiming on the other coverage is excluded under Exclusion B.3.c.2 because the demolition constituted "defective renovation or remodeling."

While Davis' failure to secure the permit might arguably be considered "faulty" or "inadequate," his failure to comply with the laws of the Town of Windsor did not cause the destruction of the building, and the court does not agree that Davis' method of demolishing the building was "defective." The evidence shows that Davis determined which approach to use to demolish the building and then carried out his plan, with the result that the building was destroyed the way he had intended. Moreover, as Nationwide asserts, the ensuing loss provision of the policy does not figure into the analysis of coverage.

Nationwide also argues that the exclusion for "acts or decisions . . . of any person" applies to bar coverage of plaintiffs' claim. Nationwide asserts that possible actual causes of the claimed loss include Davis' not obtaining an additional permit, Davis' demolition of the building, the Town of Windsor's decision to require in its permit that the building be

15

preserved, the Town's issuance of a stop-work order when the conditions of the permit were violated, the Town's decision to impose additional requirements on the project after the demolition of the building, the plaintiffs' decision to abandon the project rather than comply with the Town's additional requirements. Nationwide claims that each of these acts or decisions is excluded as a cause of loss under the policy, and that no such act or decision resulted in a covered cause of loss as defined by the policy.

In opposition, plaintiffs argue that because the loss resulted from a covered cause of loss ("collapse" caused by defective renovation), the policy exclusion pertaining to the "acts or decisions of any person" does not apply. Plaintiffs contend as with the defective renovation exclusion discussed above, the exclusion pertaining to the acts or decisions of any person falls under Exclusion B.3.b – that the exclusion does not apply on its face if the loss resulted from a "Covered Cause of Loss," which was the collapse caused by defective methods of renovation.

As Nationwide points out, plaintiffs' interpretation of "collapse" necessarily requires an intentional act by a person. Thus, coverage is excluded. Nor can there be coverage for any ensuing loss, as the destruction of the Feed and Supply Building was not a separate and independent act resulting from the loss caused by Davis' act. Rather, Davis' act was to demolish the building, and that is the loss for which plaintiffs seek coverage.

2.     Claim of Breach of Implied Covenant of Good Faith and Fair Dealing

Nationwide argues that summary judgment should be granted on the bad faith insurance claim because absent a breach of the insurance contract, Nationwide cannot be found to have acted in bad faith. Nationwide also asserts that even if plaintiffs were to prevail on their breach of contract claim, they would not prevail on the bad faith insurance claim because Nationwide's denial of the claim was reasonable and well-supported by the language of the policy.

The court finds that the motion must be GRANTED, because the court has granted summary judgment on the breach of contract claim. In California, an insured cannot base a claim for breach of the implied covenant of good faith and fair dealing on conduct by an

16

insurer that does not violate the express terms of the insurance policy. Waller, 11 Cal. 4th at 36; see also Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1153 (1990).

3.     Punitive Damages

Nationwide argues that plaintiffs are not entitled to punitive damages, as they cannot prove, by clear and convincing evidence, that Nationwide acted with oppression, fraud, malice, intent to harm, or despicable conduct. Nationwide also asserts that punitive damages may be recovered against an insurer only for conduct that goes beyond "bad faith."

The court finds that the motion must be GRANTED. In order to establish entitlement to punitive damages, plaintiffs must prove by clear and convincing evidence that Nationwide is guilty of malice, oppression or fraud. Cal. Civ. Code § 3294; Basich v. Allstate Ins. Co., 87 Cal. App. 4th 1112, 1118-19 (2001). Malice is defined as conduct intended to cause injury or despicable conduct carried on with a willful and conscious disregard of the rights or safety of other. Oppression is defined as despicable conduct which subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. Id.

Plaintiff has provided no evidence that Nationwide's decision to deny coverage resulted from malice, oppression or fraud. As with the bad faith claim, plaintiffs contend that it took Nationwide more than eight months to deny the claim, and that all indications are that Nationwide intended to deny the claim in any event. Plaintiffs also assert that there are contradictions in Nationwide's arguments in support of the present motion, referring specifically to the argument that coverage is excluded on the basis of the exclusion for defective renovation or remodeling, and the simultaneous argument that the alleged "collapse" was not caused by defective materials or methods used in remodeling. As the court has already determined, however, there was reasonable and proper cause to deny coverage. Plaintiffs were not entitled to the benefits under the policy and Nationwide did not act with malice or oppression in denying the claim.

Nationwide appears to have thoroughly investigated plaintiffs' claim. The insurer

1  obtained recorded statements from plaintiff Jernigan and from Davis; obtained
2  examinations under oath from both plaintiffs; tried to obtain a recorded statement from
3  Charnofsky but was denied by plaintiffs' counsel; interviewed Windsor Town officials; and
4  then concluded that Davis' intentional, planned, and engineered demolition of the building
5  did not constitute a covered loss under the policy, even though Davis failed to obtain the
6  required permit.

          4.        Plaintiffs' Claimed Business Loss

        Nationwide also seeks summary judgment on plaintiffs' claim of business losses. Nationwide argues that this claim was properly denied, as the reason the development project did not go forward was that plaintiffs decided not to accept the additional conditions imposed by the Town on the project, not that they were prohibited from proceeding with the project. Nationwide also argues that the claim is speculative, as plaintiffs had not entered into a specific agreement with Siduri Winery as to the key terms of the proposed lease.

        Plaintiffs contend that the claims of lost business losses are covered under the policy, and argue that it was impossible for them to go forward with the development as they had planned, because the Town of Windsor's withdrawal of the permits and demand of numerous changes to the project reduced the usable portion of the property by 50%. Plaintiffs contend that they lost the potential winery tenant because they could no longer offer the same amount of physical space.

        They also argue that the lost rental profits and the lost live/work profits are not speculative, as Nationwide claims. They assert that those lost profits have already been adjudicated by the arbitrator as being non-speculative, noting that the arbitrator found that plaintiffs had agreed to all essential terms of a lease for the remodeled Feed and Supply Building with Siduri Winery.

        The court finds that the motion must be GRANTED, because there is no coverage under the policy for plaintiffs' claimed loss. Moreover, plaintiffs' argument that they had agreed to all essential terms of the lease with Siduri Winery prior to the demolition of the building directly contradicts Scoble's testimony that no specific agreement with the winery

18

had been reached with respect to any key terms of any proposed lease, including the amount of rent to be paid. Plaintiffs provide no evidence to support this claim, apart from the decision of the arbitrator, which appears to have been based, at least in part, on evidence that did not support the claim.

### 5. Business & Professions Code § 17200 Claim

Nationwide argues that summary judgment must be granted on the § 17200 claim because a cause of action for unfair business practices must be based on a violation of an underlying "predicate" statute. In opposition, plaintiffs note that § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice," and that they do not have to establish violation of a particular statute to prevail in this claim.

However, plaintiffs have provided no evidence to support any viable claim under § 17200. In the complaint, plaintiffs allege that "[t]he above acts and practices [referring to the allegations supporting the claims for breach of contract and breach of the implied covenant] are a violation of law, unfair, and/or fraudulent, and therefore constitute an unlawful, unfair, and/or fraudulent business acts [sic] and/or practices within the meaning of [§ 17200]." Thus, it appears that they do not allege anything apart from the asserted failure to pay benefits and failure to pay benefits in good faith. Accordingly, the court finds that the motion must be GRANTED.

### 6. Nationwide's Claim of Entitlement to Set-Off

Finally, Nationwide notes that the California Superior Court determined that Davis was liable to plaintiffs for his failure to secure an additional permit before demolishing the remainder of the building, and entered judgment for more than $2.5 million in damages. Nationwide argues that even were plaintiffs able to show a covered loss, Nationwide would be entitled to a set-off of the $2.5 million judgment before it would be obligated to pay plaintiffs any policy benefits. The total of potentially available policy benefits is limited to $515,225. Thus, Nationwide asserts, no policy benefits would be recoverable from Nationwide under any circumstances. Nationwide argues that plaintiffs have already been made whole, and have not suffered any actual loss for which Nationwide can be made

19

answerable.

Having granted summary judgment on all causes of action asserted by plaintiffs in this action, the court need not address this additional argument.

7.  Plaintiffs' Rule 56(f) Motion and Objections to Evidence

As stated at the hearing, the motion for a continuance pursuant to Federal Rule of Civil Procedure 56(f) motion is DENIED.   Plaintiffs have not met their burden of showing what additional information is sought in discovery and how it would preclude summary judgment.  See Nidds v. Schindler Elevator Corp., 113 F.3d 912, 920 (9th Cir. 1996).

Plaintiffs' objections to evidence are stricken as untimely.

## CONCLUSION

In accordance with the foregoing, the court GRANTS defendant's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: February 27, 2006

_____
PHYLLIS J. HAMILTON
United States District Judge